**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 13, 2020**

# In the Court of Appeals of Georgia

A20A1413. WARE et al. v. JACKSON et al.

RICKMAN, Judge.

The facts of this case are tragic. In 2014, DeMontae Tyrone Ware was murdered by his cellmate in the Fulton County Jail, where he had been housed following his arrest on misdemeanor offenses. After his murder, it was discovered that DeMontae should have been released from the jail three months prior to his death. Linda Michelle Ware ("Ware"), in her capacity as the surviving mother and next of kin of DeMontae, and in her capacity as administratrix of his estate, filed a wrongful death action against, among others, Theodore Jackson, the duly elected Sheriff of Fulton County responsible for overseeing the jail and its personnel, as well as Lachonda Johnson, a Fulton County Sheriff's Office employee who worked in the records department of the jail. The trial court granted summary judgment to both

Jackson and Johnson after concluding that they were protected by the doctrine of qualified immunity and, further, that Ware's claims premised on negligence failed as a matter of law. Ware appeals, arguing that the grant of summary judgment should be reversed. For the reasons explained herein, we affirm the trial court's grant of summary judgment in favor of Jackson based upon the protection of qualified immunity; we reverse the trial court's ruling that Johnson was also protected by qualified immunity, but nevertheless affirm the court's grant of summary judgment in her favor on Ware's claims premised upon negligence.

On appeal from the grant of summary judgment, we conduct a de novo review of the evidence and view the undisputed facts in the light most favorable to the nonmoving party. See *Smith v. Lott*, 317 Ga. App. 37 (730 SE2d 663) (2012). So construed, the record shows that in September 2013, DeMontae, who suffered from mental illness,[1] was arrested in Fulton County on misdemeanor charges and placed in the Fulton County Jail. On June 12, 2014, a state court judge entered an order consenting to the entry of nolle prosequi, effectively dismissing all of the charges

---

[1] The complaint states that DeMontae suffered from untreated schizophrenia.

against him and authorizing his immediate release (the "Nolle Prosequi Order").[2] For reasons that are not clear from the record, the Nolle Prosequi Order was not sent to and/or went unnoticed by the sheriff's office at the time that it was issued. Consequently, DeMontae was never released.[3]

Almost a month later, the sheriff's office received a telephone call about a different inmate whose case had supposedly been dismissed and yet who had not been released from the jail. Johnson, who worked as a civilian in the jail's records department, sent an email to a state court employee inquiring about the disposition of that inmate's case. In response, Johnson received, on July 10, a copy of the June 12 calendar, which confirmed that the inmate in question should have been released; the calendar also included the dispositions of and corresponding orders on every other case called on the June 12 calendar, including DeMontae's. Johnson recognized that the record had not been updated on the inmate about whom she inquired, but took no

---

[2] A handwritten note on the Nolle Prosequi Order indicated that DeMontae was determined to be incompetent to stand trial. He was purportedly unable to pay bond, and he completed a diversion program while incarcerated.

[3] DeMontae had been visiting Atlanta from Tennessee. Ware and her husband, both of whom lived in Tennessee, were unaware that DeMontae had been arrested and had been unsuccessful in trying to contact him or determine his whereabouts.

notice or action as to the remaining inmates. Consequently, DeMontae continued to linger in the jail.

Nearly two months later, on the evening of September 6, 2014, a different inmate, Bobby Wynn, physically assaulted his cellmate and was thereafter moved into DeMontae's cell. Ware alleges, and there is evidence to suggest, that the events occurred just before a shift change and that one or more of the sheriff's office policies may have been violated as the detention officers and/or their supervisor responded to the altercation, reassigned Wynn to DeMontae's cell, and neglected to complete the necessary paperwork to document the altercation and the cell change prior to the conclusion of their shifts. Ware further alleges that the next shift of detention officers was understaffed and that and those officers failed to complete the minimum number of security rounds.

Within a few hours of being moved, Wynn killed DeMontae.[4] DeMontae was discovered just before 3:00 a.m. on the floor of his cell by guards who were distributing breakfast to the inmates. His hands were bound behind his back and a rope fashioned out of cloth was tied tightly around his neck.

_____

[4] Wynn was subsequently charged with and convicted of DeMontae's murder.

4

Ware sued Jackson and Johnson, among others, in their individual capacities, asserting claims of negligence, negligence per se, wrongful death, and false imprisonment, for their failure to keep an accurate record of DeMontae as mandated by OCGA § 42-4-7 (a),[5] and for their failure to release DeMontae within 24 hours of receiving the Nolle Prosequi Order in accordance with the terms of a previously-entered consent order in an unrelated class-action lawsuit.[6] She also asserted a claim against Jackson alleging his failure to adopt adequate policies and procedures, and failure to train and supervise his employees. In addition to compensatory damages, Ware sought to recover punitive damages and attorney fees.

Ware filed a partial motion for summary judgment on the issue of liability against Jackson and Johnson on her claims for negligence, negligence per se, and

---

[5] OCGA § 42-4-7 (a) requires the sheriff to "keep a record of all persons committed to the jail of the county of which he or she is sheriff. This record shall contain the name of the person committed . . . the day of such person's discharge, under what order such person was discharged, and the court from which the order issued. . . ."

[6] The consent order at issue stemmed from a 2004 class action lawsuit that had been filed by Frederick Harper, individually and behalf of all current and future inmates of the Fulton County Jail, against, among others, then Fulton County Sheriff, Myron Freeman, in the United States District Court For The Northern District of Georgia (Civil Action No. l:04-cv-01416-MHS), alleging unconstitutional living and security conditions at the jail.

5

false imprisonment; Jackson and Johnson each filed a cross-motion for summary judgment, seeking to dismiss all of the claims against them under the doctrine of qualified immunity. The trial court denied Ware's motion and granted Jackson's and Johnson's motions, concluding that they were both protected by qualified immunity. The trial court further reasoned that those of Ware's claims premised upon negligence failed regardless of immunity because the causal connection between the complained-of conduct and DeMontae's death was legally insufficient due to the intervening criminal acts of Wynn. Ware appeals the grant of summary judgment to Jackson and Johnson.[7]

We begin our analysis by recognizing that the doctrine of qualified immunity, which is also referred to as official immunity,[8] "protects individual public agents from personal liability for discretionary actions taken within the scope of their official

---

[7] Ware does not challenge the trial court's denial of her summary judgment motion.

[8] Although the terms "qualified immunity" and "official immunity" are used interchangeably in Georgia case law, we have adopted the use of the "qualified immunity" nomenclature to avoid confusion with the defense of sovereign immunity. See *Hill v. Jackson*, 336 Ga. App. 679, 683 (1), n.3 (783 SE2d 719) (2016); *Tattnall County v. Armstrong*, 333 Ga. App. 46, 52-53 (775 SE2d 573) (2015) (Barnes, J., concurring fully and specially), overruled on other grounds, *Rivera v. Washington*, 298 Ga. 770 (784 SE2d 775) (2016).

6

authority, and done without wilfulness, malice, or corruption." (Citation and punctuation omitted.) *McDowell v. Smith*, 285 Ga. 592, 593 (678 SE2d 922) (2009); see Ga. Const. Art. 1, § 2, ¶ IX (d); OCGA § 50-21-24 (2). "Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." (Citation and punctuation omitted.) *McDowell*, 285 Ga. at 593; see Ga. Const. Art. 1, § 2, ¶ IX (d). This protection extends to Jackson and his employees, including Johnson. See generally *Schmidt v. Adams*, 211 Ga. App. 156, 156-157 (438 SE2d 659) (1993).

There is no allegation nor evidence to suggest that either Jackson or Johnson acted with malice or engaged in intentional misconduct. Consequently, the threshold issue in this case is whether the actions or omissions forming the basis of Ware's claims against them were ministerial or discretionary in nature.

"A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." (Citation and punctuation omitted.) *Hicks v. McGee*, 289 Ga. 573, 575 (1) (713 SE2d 841) (2011). In contrast, a discretionary act is one that "calls for the exercise of personal deliberation and judgment, which in turn

entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." (Citation and punctuation omitted.) Id. at 575-576 (1).

Evidence sufficient to establish a ministerial duty may include "a written policy, an unwritten policy, a supervisor's specific directive, or a statute." (Citation and punctuation omitted.) *Wyno v. Lowndes County*, 305 Ga. 523, 527-528 (2) (824 SE2d 297) (2019); see *Roper v. Greenway*, 294 Ga. 112, 114-15 (751 SE2d 351) (2013). Procedures or instructions purporting to create a ministerial act "must be so clear, definite, and certain as merely to require the execution of a relatively simple, specific duty." (Citation and punctuation omitted.) *Wyno,* 305 Ga. 528 (2). Finally, "[t]he determination of whether an action is [ministerial or discretionary] depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." (Citation and punctuation omitted.) *McDowell*, 285 Ga. at 594-595. The ultimate decision as to whether a public officer or employee is entitled to qualified immunity is a question of law for the court to decide. See *Wyno*, 305 Ga. at 527 (3).

1. Ware argues that the trial court erred in holding that Jackson and Johnson are protected by qualified immunity and in granting summary judgment on that basis. We agree, in part.

Ware's claims are premised upon allegations that DeMontae's untimely death was caused by Jackson's and Johnson's failure to perform ministerial duties, including their failure to an keep an accurate record pursuant to OCGA § 42-4-7 (a),[9] and their failure to release DeMontae within 24 hours of receiving the Nolle Prosequi Order in accordance with the consent order. She further alleges that Jackson failed to implement appropriate policies, practices, and procedures to eliminate preventable violence in the jail and failed to properly train and supervise his employees. We will address each appellee in turn.

(a) As the duly elected Sheriff of Fulton County, Jackson oversaw nearly 1,000 employees who were responsible for general law enforcement, court security, and maintenance and oversight of the jail. As authorized by law, Jackson delegated

---

[9] Ware further relies upon OCGA §§ 15-13-1 ("All sheriffs, deputy sheriffs, . . . jailers . . . and other officers of court shall be liable to all actions and disabilities which they incur in respect of any matter or thing relating to or concerning their respective offices."); 15-16-10 (a) (8) (" It is the duty of the sheriff . . . [t]o perform such other duties as are or may be imposed by law or which necessarily appertain to his or her office"); and 15-16-24 (3) ("Sheriffs are liable for the misconduct of their jailers as they are liable for their deputies; and persons injured by a jailer have the same option in bringing an action on the jailer's bond that they have in bringing an action on the deputy's bond, provided that the sheriff shall not be liable for such misconduct and no claim or cause of action against the sheriff for such misconduct shall exist unless . . . [t]he sheriff failed to exercise ordinary care and diligence to prevent the condition or act which proximately caused the injury complained of.").

9

operational oversight to a chief deputy who, in turn, oversaw a chief jailer who was responsible for the operations of the jail and who oversaw a hierarchy of officers and employees responsible for managing and operating the jail. See OCGA § 42-4-1 (a).

The record is undisputed that Jackson had no personal contact with either DeMontae or Wynn, nor did he play any direct role in maintaining DeMontae's records or procuring his release. Likewise, Jackson did not participate in the physical or mental examinations or classifications of either inmate or in the determination of Wynn's cell assignment or reassignment. Thus, all of the claims against Jackson are necessarily premised upon his decision to delegate authority related to the operation and oversight of the jail to his employees.

Any acts or decisions made by Jackson in this regard would clearly call upon him to exercise personal deliberation and judgment based upon his experience and expertise. As such, the acts are discretionary and fall withing the scope of Jackson's qualified immunity. See *Hill*, 336 Ga. App. at 691 (3) (affirming grant of summary judgment to sheriff, in his personal capacity, who was not personally involved in the day-to-day operations of inmate management, but fulfilled his statutory duties through the establishment of contracts and policies); *Harvey v. Nichols*, 260 Ga. App. 187, 191-192 (1) (a) (581 SE2d 272) (2003) (holding that the sheriff, sued in his

10

individual capacity, was protected by qualified immunity for allegations of negligence based upon his failure to train jail employees and/or implement policies sufficient to have prevented an inmate's suicide), disapproved on other grounds by *City of Richmond Hill v. Maia*, 301 Ga. 257 (800 SE2d 573) (2017); *Carter v. Glenn*, 249 Ga. App. 414, 416 (2) (548 SE2d 110) (2001) ("The operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function of the municipality as opposed to a ministerial, proprietary, or administratively routine function.") (citation and punctuation omitted); see also *Bontwell v. Department of Corrections*, 226 Ga. App. 524, 527-528 (4) (a) (486 SE2d 917) (1997). It follows that the trial court did not err in granting Jackson's motion for summary judgment.

(b) Ware argues that the trial court erred in granting summary judgment to Johnson on the basis of qualified immunity. On this point, we agree.

Although the June 12 calendar that included the Nolle Prosequi Order was not sent and/or received through the normal channels, the record is undisputed that Johnson received a copy of both on July 10, 2014. The chief jailer and a deputy chief jailer, two of the highest ranking members of the jail's command staff, deposed that their employees had been directed and trained that upon learning of a discrepancy

11

between a court calendar and any specific inmate's record, regardless of how or when that information was obtained, the employee was required to process the calendar in its entirety to ensure that the record on every inmate listed on the calendar had been updated. The chief jailer stated that his employees, including Johnson, had no discretion to deviate from that instruction, and that written policies and procedures included step-by-step instructions detailing exactly how to process the calendar and update the inmates' records, thus initiating the process of those inmates who were to be released.

This evidence establishes that once Johnson obtained the June 12 calendar and became aware of the discrepancy between the calendar and the record of the inmate prompting her inquiry, she had a ministerial duty to process the calendar in its entirety in order to ensure that every inmate's record, including DeMontae's, had been updated. See *Hill*, 336 Ga. App. at 689-690 (2) (a) (ii) (holding jail employee had a ministerial duty to copy information from a suicide watch order onto inmate's information card); *McDowell*, 285 Ga. at 593-994 (holding school receptionist had a ministerial duty to check a student's information card to confirm the authority of a person attempting to retrieve a student for early release); see also *Carter,* 249 Ga. App. at 416 (2) ("While the act of establishing a policy in the first place is

12

discretionary, the acts of following established policies . . . are ministerial tasks."). The fact that Johnson failed to recognize her ministerial duty does not change the nature of the duty itself. See *Hicks*, 289 Ga. at 575-577 (1) (holding that appellants' failure to recognize a sentencing order as such, which in turn resulted in their failure to timely notify the Department of Corrections of the order, did change the nature of the duty from ministerial to discretionary). It follows that the trial court erred in holding that Johnson was protected by qualified immunity and in granting her summary judgment on this basis. See *Hicks,* 289 Ga. at 575-77 (1); *McDowell,* 285 Ga. at 593-954; *Hill*, 336 Ga. App. at 689-690 (2) (a) (ii).

2. Ware further challenges the trial court's holding that her claims against Johnson premised upon negligence — namely negligence, negligence per se, and wrongful death — failed because Wynn's intervening criminal act broke the causal connection between Johnson's allegedly negligent conduct and DeMontae's death.[10] We find no error.

---

[10] The trial court made no ruling on the merits of Ware's claim for false imprisonment pending against Johnson, and that claim is not at issue in this appeal beyond our conclusion that Johnson is not entitled to its dismissal on the basis of qualified immunity.

13

"It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages." (Citation and punctuation omitted.) *Goldstein, Garber & Salama v. J. B.*, 300 Ga. 840, 841 (1) (797 SE2d 87) (2017). With respect to causation, a plaintiff must prove that the defendant's negligence was both the "cause in fact" and the "proximate cause" of the injury. See *Reed v. Carolina Cas. Ins. Co.*, 327 Ga. App. 130, 132 (2) (762 SE2d 90) (2014). To show that a defendant's conduct was the cause in fact of a plaintiff's injuries, the plaintiff ordinarily must prove that, "but for this conduct, he [or she] would not have sustained the injury." *Strength v. Lovett*, 311 Ga. App. 35, 43-44 (1) (b) (714 SE2d 723) (2011). To show proximate cause, on the other hand, "the question is not whether the defendant's conduct caused the injury, but whether the causal connection between the defendant's conduct and the injury resulting therefrom is too remote to be the basis of a recovery." (Citation and punctuation omitted.) *Reed,* 327 Ga. App. at 132 (2). "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons . . . the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." (Citation and punctuation omitted.) Id.

14

Generally speaking, "an intervening and independent wrongful act of a third person producing the injury, and without which it would not have occurred, should be treated as the proximate cause, insulating and excluding the negligence of the defendant." *Goldstein, Garber & Salama,* 300 Ga. at 841 (1). But in order for the intervening act to become the sole proximate cause of a plaintiff's injuries, it "must not have been foreseeable by the defendant, must not have been triggered by the defendant's act, and must have been sufficient by itself to cause the injury." (Citation and punctuation omitted.) *Zaldivar v. Prickett*, 297 Ga. 589, 601 (2) (774 SE2d 688) (2015). As further explained by our Supreme Court,

> if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

(Citation and punctuation omitted.) *Goldstein, Garber & Salama*, 300 Ga. at 842 (1). Thus, "a general rule of proximate cause is that a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience."

15

(Citation and punctuation omitted.) Id. Stated a different way, "[o]ne is not bound to anticipate or foresee and provide against that which is unusual or that which is only remotely and *slightly* probable." (Citation and punctuation omitted; emphasis in original.) *Dowdell v. Wilhelm*, 305 Ga. App. 102, 105 (699 SE2d 30) (2010).

It is undisputed that Wynn's criminal acts intervened between any breach of duty by Johnson's failure to process the June 12 court calendar and DeMonate's death, and that DeMontae's death would not have occurred absent those criminal acts. Thus, the relevant question before us is whether Wynn's criminal act of murdering DeMontae was a foreseeable consequence of Johnson's alleged negligence in failing to process the calendar and initiate the release process.

Within this legal framework, we are constrained to conclude that DeMontae's death did not naturally flow out of Johnson's alleged negligence such that she was "bound to anticipate or foresee and provide against" it. *Dowdell*, 305 Ga. App. at 105. The murder was simply too remote to be considered a probable or natural consequence of her single act of failing to recognize that the court calendar had not been processed and thereby failing to initiate his release. See id. (holding inmate's fatal shooting of bystander several hours after and six miles away from courthouse was too remote to be a foreseeable consequence of sheriff's deputies' alleged

16

negligence in allowing his escape); see also *Goldstein, Garber & Salama,* 300 Ga. at 841 (1) (holding nurse anaesthetist's sexual assault of patient while under anesthesia was not a foreseeable consequence of dental practice's breach of duty to supervise); *Cope, v. Enterprise Rent-A-Car*, 250 Ga. App. 648, 652 (2) (551 SE2d 841) (2001) (holding assault of woman whose rental truck broke down due to rental company's failure to maintain it was "too remote to be foreseeable" ); *Perkins v. Morgan County School Dist*., 222 Ga. App. 831, 837 (3) (476 SE2d 592) (1996) (holding school defendants' allegedly negligent conduct in allowing student's early release "was, at best, a remote cause" of the student's subsequent murder).

To be sure, Wynn would not have had to opportunity to murder DeMontae had DeMontae been timely released from confinement. But our case law makes clear that liability does not attach on the basis that one's negligence "furnishe[s] only the condition or occasion" for another to cause injury. See *Cope,* 250 Ga. App. at 652 (2) (affirming summary judgment in favor of rental company for merely creating the opportunity for the stranded driver's assault); *Perkins*, 222 Ga. App. at 837 (3) (affirming summary judgment for school defendants' who "did nothing more than give rise to the occasion" for the early-released student's murder). For these reasons,

we conclude that the trial court did not err by granting Johnson summary judgment on Ware's negligence-based claims.

In summary, we affirm the grant of summary judgment to Jackson upon concluding that he is protected by qualified immunity. We reverse the trial court's ruling that Johnson was entitled to qualified immunity, but affirm its grant of summary judgment in her favor on the claims premised upon negligence.

*Judgment affirmed in part, reversed in part. Dillard, P. J., and Brown, J., concur.*